and Grace. If I may proceed, thank you for allotting us the 10 minutes that you did. One of the reasons that I'm here today is I continue to fail to find any case law directly on point involving the circumstances which were faced by the officers. I have a couple of factual questions you could help me fill in, and my questions are addressed to what's in the record. So if it can't be answered from what's in the record, there's no problem in just telling me that, okay? I will attempt to answer from the record. Did Mr. Boyer bring any kind of action against the private security officer or the owners, operators, or employees of the jewelry store? That cannot be answered from the record, Your Honor. All right. How much time elapsed between the time Mr. Boyer was handcuffed and put in the back of the police car? That's point A. How much time elapsed until one or more of the officers knew one of the following things? One, that a robbery had not, in fact, occurred. Can you tell me that to start? Your Honor, the — There came a point in time when these officers found out that, in fact, no robbery had ever happened, right? That is absolutely correct, Your Honor. How much time between the time he was handcuffed and put in the back of the car elapsed until they learned that? Your Honor, from the record, I don't have specific sites for you, but from my recollection, it was Sergeant Grace who arrived on scene at or about the time that the — Mr. Boyer was being placed in the police vehicle. Thus, he came on scene at approximately 6.02 or 6.03. Thereafter, the officers cleared the scene at approximately 6.23. So there is something between 20 and 25 minutes between the handcuffing and clearing the scene. Only a minute amount of time passed between the time that the officers completed their investigation and released Mr. Boyer and then left the scene. At some point in time, through some combination of gleaning facts, the officers found out the following. Number one, no robbery had, in fact, occurred, right? Yes, Your Honor. Number two, that Mr. Boyer had come in the jewelry store alone. Your Honor, that was not brought out through testimony. But through testimony, it was brought out that Mr. Boyer did enter the jewelry store. And that he entered the jewelry store, presented a watch that, in fact, needed repair, left the watch for repair, giving his accurate name and address. That is what he testified to, yes, Your Honor. Well, is there any evidence in the record to contradict that third point? No, Your Honor. He didn't give a false name. No, Your Honor. He didn't give a false address. Well, he did provide Full, F-U-L-L, as the city in which he lived in. And he claimed that he lived in Fullerton at the time. Okay. So from your point of view, that's the only inaccurate information he left? That is what was presented. He didn't spell out Fullerton? Well, that was what was presented at trial, yes, Your Honor. That's what the record shows. And, in fact, did somebody check his driver's license? Your Honor, it was the police officers who had his driver's license and ran a check on him. Okay. And the driver's license address was the same address that had been left in the jewelry store? That was not presented at trial, Your Honor. Well, in fact, are they the same? I do not have that information, and I can't provide that to you. I'm sorry. Okay. Can you tell us what piece of information it was that caused the senior officer on the scene to clear the situation? In other words, to say, no robbery, no casing, this is not a suspect, take the handcuffs off, let him go home. There was the complete investigation of every location which Mr. Boyer had indicated that he had gone to, the Baskin-Robbins, or I'm sorry, there was the complete investigation of every location that Mr. Boyer was seen going into, the Baskin-Robbins, Togo's, the Papa John's Pizza, the Sports Town, and the jewelry store. There was the search of the vehicle, which revealed no instrumentalities of any type of future crime. Done with his consent. That's the position of the ---- That's the fact, isn't it? Why do you keep arguing with the facts? He gave the police his consent to search his vehicle. Why are you even arguing about that? Oh, I'm not, Your Honor. Okay. It is the ---- You keep saying it's the defendant's position that the fact is he gave them consent, they searched pursuant to that consent, and found nothing. That is true, Your Honor. So why don't you just come clean on this? I mean, this whole thing sounds like a Keystone Cop scenario. I mean, it's, you know, it's kind of laughable. A store employee and a security guard, you know, tell 9-11 after this that there's no robbery. They just thought the person was casing. And then the officers are told at one time that there was a white man with a black woman, and then it turns out to be incorrect. And they're told there's first a robbery, and then there's no robbery. And he did leave his watch in there. He got a receipt. He looked at another watch and decided he didn't want to try it on. And this whole thing is just one big screw-up after another. Isn't that what it is? Well, Your Honor, I believe the screw-up was in the jewelry store providing the information to the officers that he was involved in a casing. Yeah, but how about when the 9-11 person was told there's no robbery? Your Honor, the 9-11 person. When the 9-11 person broadcast there was a white man and a black woman, which was. . . The information that was received. So all this confusing information goes on. And what was the. . . Did they give a description of what this man was? Wasn't he 6 feet tall or somewhere in his 30s? And this guy is, what, in his 40s? And. . . Well, some of us in our 40s do look like we're in our 30s, I'm hoping, but. . . I gave you that as an easy. . . Thank goodness for that. In any event, as we sit here today, the scenario that we've just been through, that is whatever it was that happened in that jewelry store, however much time elapsed while Mr. Boyer was handcuffed sitting in the back of a police car and piecing together this information was presented to a jury. And while they could reach a verdict on excessive force, unlawful arrest, that sort of thing, they couldn't come to a verdict on unlawful detention. And the question I guess we have is do we affirm and let it go back and be retried or settled or whatever, or do we now say now that we know everything, qualified immunity applies? Well, Your Honor, I believe that qualified immunity is the issue that is presented to court so that the officers can't avoid a retrial in this case. That is what we're seeking to avoid, the retrial. And here you go through and you've indicated that it's the Keystone cops and that it was one error after another. My position as I read through the record was that it was one error after another with the police officer simply trying to confirm or dispel the information that they were being provided. After they dispelled the information. What they did, the first thing they did was they went into that, where was it, the malt shop or was it the pizza shop, and they grabbed him and they handcuffed him.  Yeah, they could have just called him outside and said, look, you know, we've got this information and just made a Terry stop, patted him down, no weapons. He had no weapon on him. No weapon in the car. I mean, all they had maybe at best was a Terry type stop. And so what was the need to handcuff this man? Your Honor, at the time that Officer Mossbrook arrived, he was provided information through the dispatch that a weapon had been brandished. At the time that he made the contact. And then the dispatch guy, through dispatch, dispatch said a weapon had been brandished? That's correct, Your Honor. And who told that to dispatch? That is not in the record, and I cannot provide that information even outside. We don't even know where dispatch got that information. Don't even know. But what we do know is that information was received by the officers prior to the contact with Mr. Boyer. We do know that it turned out that Mr. The officers get all this information about the fact that there was a 25-year-old white man and a black female there. That was also through dispatch. Yeah, they get that. Yeah. And so they had all this, and then they got the information that no robbery had occurred. Well, Your Honor, if I could maybe back up just so that. Where did they get that information? They got that? The information that no robbery had occurred had been given by the jewelry store once the contact had been made after Mr. Boyer had been taken into custody. If I could just go back into the facts and how they laid out. Upon presenting to the scene, Officer Mossbrook was faced with a security guard, a mall security guard, who indicated to him that there's the guy. He's in 31 Flavors, the guy you want's in there. Officer Mossbrook at that time knew that the call had gone from a 211 to a grand theft. A weapon had been brandished that there was a white male and a black female who had left the scene, and those were actually either undisputed or stipulated facts, Your Honor. So at the time that Mr. Boyer was contacted in the 31 Flavors, the officer had no reason to disbelieve that Mr. Boyer didn't have a weapon. There was nothing for Officer Mossbrook to disbelieve about the fact that he had been involved in a crime occurring in the jewelry store. He wasn't a white man, was he? No, but he was pointed out by the security guard as that's the guy. Officer Mossbrook then took the time to have that security guard follow him and say, that's the guy, and pointed to Mr. Boyer directly. Officer Mossbrook actually dispatched that information over the radio to the other officers who indicated that when they arrived on scene, it was their understanding that there was also a black male suspect via Officer Mossbrook's statement on the radio. So the detention and the initial handcuffing of Mr. Boyer occurred when the information from dispatch was known, in addition to being Mr. Boyer being pointed out by a security guard on scene. That is all the information that the officers had. Was there probable cause to arrest Mr. Boyer at that time? No, Your Honor. I can honestly say that they had not performed any further investigation, but there was reasonable suspicion to have stopped him and detained him. Then what do you do at a Terry stop? You pat him down for weapons. That is correct. You ask him a few questions. That's all. But, Your Honor, officers doesn't allow, does a Terry stop allow you to handcuff somebody and put them in a police car? Absolutely. I think this Court is, when I say this Court, I think the Ninth Circuit has indicated that merely by handcuffing someone and placing them in the back of a car, that does not convert a Terry stop into a full-blown arrest. And I think I've cited some authority to the Court in my briefs on that point. You take everything in the totality of the circumstances. Mr. Boyer did not have a weapon on him, but there were two suspects at large and still the information that a weapon had been brandished. These officers didn't know if Mr. Boyer was with other individuals or if there was a weapon located in Mr. Boyer's car, on the persons of Mr. Boyer's alleged accomplices. The Mr. Boyer also testified that he was yelling, hollering, and angry. The officers had a right to do that. Does that justify continued detention? That alone does not, Your Honor. It was the continued investigation of the alleged casing that allowed, well, what my position is, is that the continued investigation into the casing allowed these officers to continue to detain. So the fact that he was angry and upset and said some things is really meaningless for the purpose of this case, isn't it? Well, Your Honor, if you agree that he had the right to handcuff the suspect or Mr. Boyer and place him in the car, I'm saying that the totality of the circumstances is Mr. Boyer was creating a disturbance. He was yelling and hollering. The officers simply intended to go about their business, to investigate the issue. And placing Mr. Boyer in the back of the car was the easiest available choice for these people. My understanding is the yelling or comments occurred after he was handcuffed and put in the car. Mr. Boyer testified that he was taken by surprise by the officers. He was taken off guard and immediately began asking what was going on, what was happening. Also, our position, well, the boy. He got mad when he was in the car handcuffed. That's when he started to get upset. Well, Mr. Peralta, the Verizon Store employee, I believe, also testified that Mr. Boyer was yelling and questioning the officers' behavior before being placed in the car. But I am not intending. Was he handcuffed at that time? Absolutely, Your Honor. If the time period is roughly 20, 22 minutes? I think it could go as much as 25, Your Honor. Okay. If they kept him there for 90 minutes, would that be reasonable? Your Honor, under the circumstances. Can I have a yes or no? Would 90 minutes be reasonable? It would likely not be given. With 60? Likely not, Your Honor. With 45? Not likely, Your Honor. But 22 is okay? Because of the facts in the record showing that they completed their investigation. Why shouldn't we let a jury decide whether that period of time is reasonable for purpose of unlawful detention? Because the case law is not clear that an officer may continue to detain an individual while they investigate a casing. And I appreciate the time that you've given me, but that is the position, is the issue of qualified immunity and the fact that police officers as well as Mr. Grimes just didn't know what's reasonable under the circumstances because the case law is not clear. Well, that's what you have juries for. But that's what also qualified immunity allows an officer to avoid the expense and problems of trial. Of course, there is one way to avoid that. Oh, please don't enter judgment against them. No, no. There is a way for you to avoid that for them. Settle the case. Oh. Just a thought. Your time's up. Okay. Thank you, Your Honors. You probably, probably. Were you the trial attorney? Yes, I had the pleasure of being the trial attorney. It was probably your winning smile that did it, I'll tell you that. Well, thank you, Your Honor. I'm not very good. That would be a scary opponent. Go ahead. Good morning, Your Honors. Bernadine Zunmegeson for the appellee, Ivan Boyer. I only have a couple of. Did you represent him at the trial? I did not, Your Honor. I have a couple of points to clear up in terms of the timeline. I believe Your Honors asked about the weapon being brandished and knowledge, what knowledge the police officers had of that. I believe on the record what happened was that the call went in that a robbery was in place and that a weapon had been brandished, and only later on officers found out, because they were reported to, that the robbery had been downgraded from a larceny. So when they arrived at the scene, yes, they had been told that a robbery had occurred and the weapon had been brandished, but they'd also been told that the entire incident had been downgraded to a larceny. What was the larceny? I have no idea. I believe that they thought that these two individuals, the white male and the black woman, had maybe been. How do you get from an armed robbery to a larceny? I don't know, Your Honor. That's one of my questions also. Okay. When they did approach the security guard, the security guard did point out Mr. Boyer was a suspect in the case, but as Your Honors have also pointed out, the officers knew that the suspects in the supposed crime were a white male and a black female. Mr. Boyer didn't fit that description. The officers never questioned the security guard as to why he thought Mr. Boyer might have been that individual. As we sit here today, the issues of probable cause and right to arrest and use of excessive force, that is whether they should have just patted him down or not, those are kind of by the wayside, aren't they? Right. The whole focus of our inquiry is whether that period of time handcuffed in the back of the police car for 20 to 30 minutes constitutes an unlawful detention and whether, given the facts that were put before the jury and where they couldn't reach a verdict, entitled these officers to qualified immunity or not, now that the facts have been flushed out. Right. Your Honor, I didn't mean to imply that these facts apply to the unlawful arrest. But one of their claims is that there was casing, and the police officers reasonably believed that Mr. Boyer might be casing the scene. Now, the only facts that they ever give to Mr. Boyer's supposed casing is that he was an individual who lived in Fullerton, who came into Santa Ana, dropped off his watch at a Santa Ana watch store, then proceeded to do some shopping. He went to the sports authority or the sporting goods store. He went to Papa John's to buy a pizza. He exited without a pizza, but he went to the Baskin-Robbins to get an ice cream. Now, they say that he was there for over an hour, and that that in and of itself is suspicious casing. The appellants in their own brief on page 7, paragraph 1, indicate that within 15 minutes of Sergeant Grace's arrival, the officers had sufficient information to conclude that Mr. Boyer had not committed any crime in the jewelry store. And even at that point, they knew that no robbery had occurred, no brandishing had occurred, or at least Mr. Boyer wasn't part of that. And at that point, they still chose to interrogate Mr. Boyer, keep him handcuffed in the car, and to search his car. This was how many minutes after he had been placed in the back of the car? Well, the record isn't very clear, and I agree with appellants, that during trial that the timeline wasn't nailed down. They say that if the longest period of time that of the 20 to 30 minutes, what's the longest period of time that could have elapsed before they found out this is not the guy, and what we've been told simply didn't happen? I would say between 10 and 15 minutes. There's enough time for the officers. Well, let's say it was 15 minutes. Okay. So are you telling the panel that 7 minutes of continued detention is sufficient to send this back for a retrial? Absolutely. I believe that once the police officers knew that Mr. Boyer had not committed any crime, he didn't fit the description of any suspect in any crime, that even holding him for a minute beyond the time it takes to release him, I understand there's some degree of time to release him, but if the officers were to say, it will only take us 30 seconds to search your car, let us search your car, that that would be too much time. They knew that there was no longer cause for them to hold him, and they chose to hold him. Well, when they had the meeting outside the car, they certainly argued that that was a time that they determined that they really had no reason to hold him, and that they just wanted to search his car just in case something turned up, and they could say, aha, you know, we got the right guy. So your argument is that when the officers met there and they had this conferred, at that time they knew that they had no probable cause to arrest him, and that that's when the time was to let him go. Correct, Your Honor. And I actually believe that by me taking appellant's testimony that it was 15 minutes after Sergeant Grace's arrival, that's actually being generous. When the officers arrived on the scene, the officers, there were multiple officers, they were dispatched to the various areas within the mall area. And one of the very first places they went to was the jewelry store, and one officer went in there within a few minutes of arrival and determined that Mr. Boyer had nothing to do or there was not a robbery that had ever occurred. And at that point, I believe that the officers were on notice that perhaps they didn't have someone who was a reliable suspect. Did they know at that time that he'd gone in there and left his watch to be repaired and got a receipt for it? To be honest, when the officer was examined at trial, I believe that he said he doesn't remember what the jewelry store told them, and no one really remembered the incident that occurred, the conversation that occurred between the jewelry store and Officer Romero. But given the fact that it is a fact that Mr. Boyer had gone into the jewelry store, left his watch and his full name and address, I believe that it should have been clear to Officer Romero and the jewelry store employees that it wasn't him. He wasn't a white male or a black female. Okay. Anything else? No. Thank you, Your Honors. Thank you, Your Honors. I ran out of time, and I'll submit on the record and the pleadings. Oh, you're way over, see, seven minutes. Yeah, I can't believe I did that. But I enjoyed it. Thank you for the opportunity. Well, that's all right. We'll add that on to the 22 minutes. Oh, am I in trouble. Thank you very much. Okay. We won't do that. Okay. Thank you, Your Honors. The next item is Drakeford. Can I take a break? Oh, yeah. Well, it's the U.S. versus Gonzales-Lopez. That's submitted. Now we come to Drakeford versus the County of Orange. Okay. You ready to go? All right. Thank you. The other case of BCX Limited versus Botches, that's also submitted.
judges: Pregerson, Hall, Hawkins